## WILL MOSS v. THE STATE.

No. 220.    Decided January 26, 1910.

Rehearing denied April 13, 1910.

**Murder—Charge of Court—Self-Defense—Interference of Deceased.**

Where, upon trial for murder, the evidence showed that while defendant and another had an altercation, the deceased interfered and was killed by the defendant; and the defendant's testimony showed that the deceased not only interfered in the altercation between the defendant and the other party, but that when the altercation had ceased between the defendant and said third party, the deceased assaulted the defendant with a piece of a fence rail and struck the defendant with it, and that then the defendant cut him with a knife which killed the deceased, the court should have submitted this issue to the jury, as requested, although the court's general charge on self-defense was sufficient.

Appeal from the District Court of Hunt.    Tried below before the Hon. R. L. Porter.

Appeal from a conviction of manslaughter; penalty, three years imprisonment in the penitentiary.

The opinion states the case.

*Neyland & Neyland* and *H. B. Mock,* for appellant.

*John A. Mobley* and *C. A. Leddy,* Assistants Attorney-General, for the State.

RAMSEY, JUDGE.—Appellant was indicted in the District Court of Hunt County on the 8th day of May, 1908, charged with the murder of one Arthur Davis.

The evidence, in brief, shows that appellant had for some time before the fatal difficulty been working for one F. E. P. Harrell in getting out railroad ties. On the day before the difficulty there was some little disagreement between Harrell and appellant growing out of the fact that appellant had carried a load of ties to town instead of waiting for Harrell to take the wagon there. That the next morning Harrell was working in his field when appellant came to where he was, and the unpleasantness and difficulty started between appellant and Harrell. As to what took place at this time, there is quite a difference in the testimony. Harrell says that appellant came to where he was angered, with his knife out, and said to him in substance that if he did not take back what he had said that he would kill him; that he kept telling appellant that there was no use for any trouble, and kept trying to reason the thing with him. That about this time deceased, Arthur Davis, came up, and appellant drew his knife and continued cursing him, Harrell. That they were standing close together, appellant with his drawn knife, when Davis appeared, who told appellant not to jump on him, Harrell, because he was an old man not able to fight. That thereupon appellant replied, "What is it your damn busi-

ness? What you got to do with it?" That he, Harrell, then broke and ran about fifteen steps and got a piece of fence rail to protect himself; that just as he picked up the rail appellant made for him with his drawn knife; that he struck appellant with the rail, and that as appellant approached him Davis was right behind him; that when he hit appellant he fell to his all-fours; appellant jumped up as quick as he could and ran into him with his knife and cut at him four or five times. That Davis took hold of appellant and pulled him off, and that he then stabbed Davis, who turned to run, when he cut him in the back again. That Davis took hold of appellant to pull him off of Harrell; that he stabbed Davis in the breast twice, and once in the back as he started to run. Appellant gives the following account of the controversy at the immediate time of the killing:

"When I got over there I went to where Mr. Harrell was, in the field, and went on up to where he was at, and went up and took hold of the plow, and asked him what he was mad about? what had I done to make him mad? and he said, nothing he knows of. I said he had accused me of running off with the team, and he said, 'I guess not;' and I said, 'I didn't know it if I had.' There wasn't any argument between us, what I have said was about all that was said. All that time I was standing there and holding the plow handle. There was none there at that time but me and Mr. Harrell. He and I did not have any dispute about anything at that time; he had a dispute that morning. Might say we had a dispute, too, he was really disputing. I said, 'You accused me of running off with the team;' he said, 'You did.' I said, 'I didn't.' He said, 'You did.' I said, 'I didn't.' I saw two men coming down the road, Miller and Cowan; then these two other parties coming across the field here, Arthur Davis and Mason. They were about thirty or forty steps away, maybe. Mr. Harrell did not leave his place while we were talking; he was standing at the same place while this talk was going on and while they were coming. After they came up, he said, 'No, drive out where I go out at,' and I said, 'No, I will drive out to the gap where it will be closer to you.' There was a gap I had in the fence over there to go out of his pasture. It is not a fact that when I got back through the fence the first thing I said to him was, 'Old man, God-damn you, if you don't take that back I am going to kill you.'

"In passing with the horses I saw old man Harrell at home. He said, 'Will, come by,' and I told him no, I didn't want to. I did not curse him at all. When I got over the fence the next morning I did not tell old man Harrell I was going to kill him if he didn't take back what he said, disputing my word. When Mr. Harrell and I were talking, Arthur Davis came around there and said, 'You are not going to jump on that old man.' Old man Harrell did not slip off to the corner of the fence at that time. He went just after I had that dispute there. I hadn't attempted to jump on old man Harrell at that time, had not attempted to cut or strike him, yet Arthur Davis came

there and said, 'You are not going to jump on this old man.' Old man Harrell left and went off about fifteen steps, where he got this rail. The old man had a rail and turned around and I went on to him. He stepped back a step or two and threatened to kill me and I went on to him. He came one step or two and I went about fifteen steps and met him. I still had the knife in my hand. Davis did not follow right then, he came when Harrell called him, after he had hit me with the rail. I did not fall on my all-fours. Davis reached over the old man's head and got the rail; Davis was not behind me at that time. He come from this direction up behind me and walked around and reached up and got the rail and was fixing to hit me. Mr. Harrell walked around the team and come around here and stopped in a position out there; he went and got a rail and turned around and started back with it and I saw trouble was up. I thought I would go down and catch hold of the old man and stop it there if I could. He was coming towards me with that rail. I was aiming to catch him and he hit me. After he hit me I reached and took him by the arm. He hit me right there on the left side of the head. He hit me with a half a rail or a little more. He did not knock me down. Davis at that time was back here. When Harrell hit me with the rail that lick, Davis started—Mr. Harrell laid the rail down and said, 'Davis, what are you doing? What are you doing, Davis?' And raised the rail to hit me again and Davis said, 'Uncle Fount, let me have it and I will do the work,' and reached up over Harrell's head and got the rail. He turned with his back to me, and when he took the rail I stepped back here two or three steps and when he got turned around in position he lammed it to me, hitting me in the same place Mr. Harrell had hit me. That did not knock me down, it staggered me right sharply. Then he made two other efforts to hit me again and I cut him and he turned and run. I had my hand in this kind of position, up this way (indicating) and cut him light as I could. I was sorter in this position. That was after Davis had hit me with that rail. I did not make any attempts to cut Mr. Harrell. The reason I advanced towards him when I did, I saw trouble was coming up and thought I would go and catch the old man and stop it if I could. He had the rail in his hand at that time. He was coming toward me. I did not make any movement toward Davis of any kind before he hit me with the rail, just fixed myself, watching that rail as it come over, was all, trying to dodge it the best I could. Davis made about two other efforts there, and I thought that was the best, some way another to stop it if I could. I considered myself in danger at that time. That was a half a rail or longer, and the butt end of it was a good, big thing, maybe four or five inches. It was an oak rail, the best I remember, an old rail. It looked to be about four and one-half feet long. Davis did not make any motions at me as if to hit me again after he hit me and made them motions there and I cut at him. After Davis quit hitting me and Cowan caught him there I left, did not make any

more movement towards him, and did not make any movement toward Harrell after that. After Cowan caught Davis I went and got my hat and left."

There was an issue in the case as to whether the wound was a mortal one, and that death resulted from improper treatment. These matters were, we think, sufficiently submitted in the court's charge, and need not be further considered. The conviction was for manslaughter, and the verdict assessed appellant's punishment at confinement in the penitentiary for three years.

1. The court charged on the subject of self-defense as follows:

"A reasonable apprehension of death or great bodily harm will excuse a party in using all necessary force to protect his life or person, and it is not necessary that there should be actual danger, provided he acted upon a reasonable apprehension of danger as it appeared to him from his standpoint at the time, and in such a case the party acting under such real or apparent danger is in no event bound to retreat in order to avoid the necessity of killing his assailant, but may stand his ground and kill his adversary, if necessary.

"If from the evidence you believe the defendant killed or assaulted the said Arthur Davis, but further believe that at the time of so doing the deceased had made an attack or hostile demonstration on him, or was about to do so, or it reasonably appeared to the defendant he was about to do so, which, from the manner and character of it, caused the defendant to have a reasonable expectation or fear of death or serious bodily injury, and that acting under such reasonable expectation or fear, the defendant killed or assaulted the deceased, then you should acquit him.

"If from the evidence you believe the defendant killed or assaulted the said Arthur Davis, but further believe at the time of the killing or at the time of the assault the defendant believed that the deceased and one F. E. P. Harrell were acting together for the purpose of taking his life or inflicting upon him serious bodily injury, and if you further believe that the said Davis and Harrell or either of them made an attack or hostile demonstration on the defendant, which, from the manner and character of same, created in the mind of defendant a reasonable expectation or fear of death or serious bodily injury, and that acting under such reasonable expectation or fear the defendant cut and thereby killed, or assaulted the deceased, you will find the defendant not guilty." And also as applicable in applying this issue to the facts thus instructed the jury:

"If you believe from the evidence that the defendant sought F. E. P. Harrell at the time of the difficulty for the purpose of having a friendly talk with him, and not with a view of provoking a difficulty and a difficulty ensued, and if you believe from the evidence that during the progress of said difficulty it reasonably appeared to the defendant that the said F. E. P. Harrell and the deceased, Arthur Davis, were acting together for the purpose of taking his life or doing him some serious

bodily injury, and if it reasonably appeared to the defendant that the said Harrell and the said Davis or either of them was about to take his life or inflict upon him serious bodily injury and he cut and thereby killed or assaulted Arthur Davis, for the purpose of preventing such injury or apparent injury, then in that event he would not be guilty of any offense.

"Every person is permitted by law to defend himself against any unlawful attack or hostile demonstration either real or apparent which reasonably threatens injury to his person and is justified in using all necessary or reasonable force to defend himself, but no more than the circumstances reasonably indicate to him to be reasonably necessary."

We think these charges on the issues of self-defense are and were sufficient.

2. In instructing the jury with reference to the right of Arthur Davis to interfere for the protection of Harrell, the court, among other things, thus instructed the jury:

"You are further instructed that if you believe from the evidence beyond a reasonable doubt that the defendant was making an unlawful assault upon F. E. P. Harrell, then the deceased, Arthur Davis, had a right to interfere to prevent such unlawful assault and to use such force as was reasonably necessary to prevent such assault, and if the defendant cut and thereby killed the deceased when the deceased was interfering to prevent the defendant from making an unlawful attack upon the said F. E. P. Harrell, and the deceased was only using such force as was reasonably necessary to prevent such assault, if any, the defendant would be guilty of an unlawful homicide."

In this state of the case, counsel for appellant requested the court to give the following charge:

"The law gives the right to one person to interfere in the necessary defense of another to protect him from an unlawful and violent attack, when such unlawful and violent attack is such that the person so attacked is in immediate danger of serious bodily injury or death. The person interfering may use such force as is necessary to prevent the injury threatened, but such force can only be used while the person is in the very act of making the unlawful and violent attack, and such person interfering in such case in behalf of the person about to be injured is not justified in taking the life of the aggressor unless the person attacked is in immediate danger of serious bodily injury or death.

"Therefore, if you believe from the evidence that the defendant did make an unlawful and violent attack upon F. E. P. Harrell, and that the deceased, Arthur Davis, interfered, which interference was in the necessary defense of the said Harrell, and that the deceased pushed, pulled, shoved or struck the defendant with his fist and caused the defendant to cease his unlawful and violent attack, if you believe that he was making an unlawful and violent attack, and after the defendant had ceased said attack on the said Harrell the deceased, Arthur Davis,

retreated and secured a piece of rail about four feet long and three or four inches thick and returned to where the defendant was and struck the defendant on the head and inflicted a wound, and at the time the defendant was making no attack or threatened attack upon the said Harrell, such attack upon the defendant by the deceased, Arthur Davis, was unlawful, and the defendant had the right to defend against said attack and to use such attack, and if it reasonably appeared to the defendant, viewed from his standpoint, that he was in danger of serious bodily injury or death, from such attack, and he cut the deceased in resisting such attack, then the defendant would be justifiable and you will find the defendant not guilty."

This charge, we think, should have been given. It was undoubtedly the law of the case, was applicable to the facts as raised by the testimony of appellant, and was in a sense an elaboration of the court's charge, and was directly applicable to the facts in evidence. The case was one very difficult to clearly submit, and for the most part the court acquitted himself well of the difficult task, but we are clear that this issue under the facts should have been submitted substantially in the language of the charge requested.

There are many other questions raised in the record, many of which can not occur on another trial, and need not, therefore, be noticed.

For the error pointed out, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

McCord, Judge, not sitting.
[Rehearing denied April 13, 1910.—Reporter.]